IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DEREK LEAP,** | : | |
| *Plaintiff*, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| **TAKASHI YOSHIDA et al.,** | : | No. 14-3650 |
| *Defendants*. | : | |

**M E M O R A N D U M**

PRATTER, J.                                                                                                                                    APRIL 29, 2016

**I. INTRODUCTION**

Derek Leap, a former member of the wait staff at Hikaru Center City and Hikaru Manayunk, two restaurants in Philadelphia, sues Takashi Yoshida, T.B. Yoshida Inc., and TNM Corporation for various alleged tip-related wage violations. T.B. Yoshida Inc., and TNM Corporation, both controlled by Takashi Yoshida, are the corporate owners of the Hikaru restaurants. In this lawsuit, Mr. Leap alleges that Mr. Yoshida, T.B. Yoshida Inc., and TNM Corporation (a) illegally required tip employees to share their tips with non-server employees, (b) improperly took a tip credit against the minimum wage of tipped employees, and (c) deducted an "excessive portion" of the tips that customers left on credit cards for Mr. Leap and other servers. Mr. Leap alleges that these actions violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206, 216(b), the Pennsylvania Minimum Wage Act, 43 Pa. Stat. §§ 333.101 *et seq.*, the Pennsylvania Wage Payment and Collection Law, 43 Pa. Cons. Stat. §§ 260.1 *et seq.*, and the Philadelphia Gratuity Protection Ordinance, Phila. Code § 9-614. Mr. Leap also claims that the Defendants' retention of the gratuities constituted conversion and unjust enrichment.

The Defendants deny all of the allegations and maintain that their compensation practices were lawful. In particular, the Defendants claim that all participants in the tip pool were "front

1

facing" who directly earned tips by waiting on customers and participating in customer service. The Defendants also claim that they acted in good faith at all times.

Mr. Leap filed a Motion for Class Action Certification of the State Law Claims and a Motion for Conditional Certification of Collective Action under § 16(b) of the FLSA. Before the Defendants responded to the Motions, the parties reached a settlement designed to resolve both the class action and collective action claims.

Accordingly, currently before the Court are the following motions: Joint Motion for Approval of the Revised Amendment to Joint Stipulation of Settlement and Release, Plaintiff's Motion for Final Approval of Class and Collective Action Settlement, and Plaintiff's Petition for Award of Attorneys' Fees, Costs, and Class Representative Service Award. For the reasons discussed below, the Court will grant the Joint Motion for Approval of the Revised Amendment to Joint Stipulation of Settlement and Release and Plaintiff's Motion for Final Approval of Class and Collective Action Settlement. As to the Plaintiff's Petition for Award of Attorneys' Fees, Costs, and Class Representative Service Award, the Court will grant the Motion in part and deny the Motion in part.

## II. PROCEDURAL BACKGROUND

After Mr. Leap filed his Motion for Preliminary Approval of Class and Collective Action Settlement, the Court held a Preliminary Approval Hearing. At the hearing, the Court identified several parts of the Settlement Agreement and the Proposed Notice of Settlement—primarily involving the Settlement Agreement's effect on plaintiffs who neither opt in nor opt out of the litigation—that required clarification. After the parties revised their original Settlement Agreement and Proposed Notice of Settlement to address the Court's concerns, the Court held a Second Preliminary Approval Hearing, and preliminarily approved the settlement soon

thereafter. The proposed settlement attributed all damages to the FLSA claim and none to the class action claims.

In the Memorandum Opinion preliminarily approving the settlement, the Court noted that "maintaining a class action and a collective action in a single lawsuit has the potential to prejudice a subset of plaintiffs," but concluded that "the attribution of damages to the FLSA claim rather than the class action claims does not present an obvious deficiency *at this stage of the litigation*." *Leap v. Yoshida*, No. CIV.A. 14-3650, 2015 WL 619908, at *5 (E.D. Pa. Feb. 12, 2015) (emphasis added). Although the Court noted that "there is a risk that those Class/Collective Members who neither opt in nor opt out may waive their class action claims *and* receive no settlement payment," *id.* (emphasis in original), the Court gave three main reasons for preliminarily approving the settlement despite that risk:

> First, Plaintiffs represented to the Court that evidence gathered during discovery makes the FLSA claim much stronger than the class action claims, so it may be appropriate to attribute the Settlement Payment to FLSA damages. Second, because the Settlement Agreement treats members of the putative Class and the putative Collective identically, attributing damages to the FLSA claim will not prevent any Class/Collective Member who opts into the lawsuit from receiving a payment. In other words, no Class/Collective Member will be unable to receive his or her share of the Net Settlement Fund because the damages are attributed to the FLSA claim. Third, a high percentage of Class/Collective Members may yet opt in to the litigation, thus obviating this particular concern.

*Id.* At the same time, the Court noted that it would "likely consider this aspect of the settlement more closely at the final fairness hearing when more certainty about the actual exercise of options by the Class/Collective Members will be known." *Id.*

After the notice period, Class Counsel filed a Motion for Final Approval of the Class and Collective Action Settlement. Although there were no objections to the settlement agreement and no Class Members decided to opt out, only 17 of the 75 Class/Collective Members (23%) became Opt-In Plaintiffs who were set to recover from the settlement fund.

3

A Final Fairness Hearing was held, during which the Court expressed more pointed concerns regarding the structure of the settlement agreement. Particularly, the Court highlighted the fact that 100% of the recovery was attributed to the FLSA claim whereas none was attributed to the class action claims which were still being released. This concern was exacerbated by the fact that only 23% of the Class/Collective Members were set to recover from the settlement fund, yet all Class/Collective Members would be releasing their class claims. The Court asked the parties to provide examples of other cases in which a similar structure to a settlement agreement was used. After reviewing the submissions provided by the parties, the Court held a chambers conference, during which the Court expressed concerns that the proposed settlement agreement might not pass muster under Rule 23(e)(2).

Following the conference, the parties filed an Amendment to Joint Stipulation of Settlement and Release[1] accompanied by a Joint Motion for Approval of Amendment to Joint Stipulation of Settlement and Release.[2]

## III. TERMS OF THE AMENDED SETTLEMENT AGREEMENT

The Amended Settlement Agreement defines "Class/Collective Members" as "all employees who worked at Hikaru Center City and Hikaru Manayunk from June 14, 2011 until October 5, 2014." *See* Joint Stip. of Settlement and Release at ¶ 1.6. Under the Amended

---

[1] Due to a slight modification of the attorneys' fees and costs requested (detailed in footnote 5, *infra*), Class Counsel subsequently filed a Revised Amendment of Joint Stipulation of Settlement and Release.

[2] After the parties filed the Amendment to Joint Stipulation of Settlement and Released, the Court asked the parties to brief the issue of whether an additional round of notice and an additional final fairness hearing were required following the proposed amendment. Generally, class members need not be informed of amendments to a settlement agreement when the proposed settlement is more valuable with the amendments. *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 473 (D.N.J. 1997). Under the Amended Settlement Agreement, class members have only benefited and "class members who declined to opt out earlier, would not choose to do so now." *Id.* As a result, the Court will not require an additional round of notice and an additional final fairness hearing.

Settlement Agreement, every member of the putative Class is also a member of the putative Collective, and vice versa. The Amended Settlement Agreement provides that Defendants shall pay a maximum settlement amount of $225,000 (the "Settlement Payment"). *Id.* at ¶ 3.1. The Settlement Payment includes attorneys' fees and costs, a service claim to Mr. Leap, and payroll taxes on back pay owed to Class/Collective Members. *Id.* at ¶¶ 3.2-3.4. The remainder of the Settlement Payment (the "Net Settlement Fund") will be split between FLSA damages and class claim damages, with 60% of the fund attributed to the FLSA claim and 40% attributed to the class action claims. *See* Revised Am. to Joint Stip. of Settlement and Release at ¶ 3.5.

Each Class/Collective Member's share of the Net Settlement Fund will be determined by multiplying the Net Settlement Fund by the quotient of the number of hours the Class/Collective Member worked as a server at Hikaru Center City and/or Hikaru Manayunk between June 14, 2011 and October 5, 2014, and 26,353 hours (the total number of hours that all servers worked at those restaurants during the relevant time period). Joint Stip. of Settlement and Release at ¶ 3.5. Class/Collective Members who opted in to the lawsuit will receive 100% of their respective share of the Net Settlement Fund. Class/Collective Members who failed to opt in to the lawsuit will receive only the damages attributed to the class claims. Because 40% of the damages have been attributed to the class claims, those Class/Collective Members who did not opt in will receive a check for 40% of their respective share of the Net Settlement Fund. Any money that remains from the Net Settlement Fund after payments are made to the Class/Collective Members, including any uncashed checks, will be returned to the Defendants. *See* Revised Am. to Joint Stip. of Settlement and Release at ¶ 3.5(N).

In return for their share of the Net Settlement Fund, the Opt-In Plaintiffs will release all claims under the FLSA, the Pennsylvania Minimum Wage Act, the Pennsylvania Wage Payment

5

and Collection Law, and the Philadelphia Gratuity Protection Ordinance, as well as all claims of common law conversion and unjust enrichment. Joint Stip. of Settlement and Release at ¶ 3.7. Class/Collective Members who did not opt in will release all of the above claims except for their claims under the FLSA.

## IV. DISCUSSION

### A. Class Certification

If the reviewing court has not yet certified a class, it must determine whether the proposed settlement class should be certified for purposes of settlement. *Amchem v. Windsor,* 521 U.S. 591, 620 (1997). The class must be "'currently and readily ascertainable based on objective criteria,' and a trial court must undertake a rigorous analysis of the evidence to determine if the standard is met." *Carrera v. Bayer Corp.,* 727 F.3d 300, 306 (3d Cir. 2013) (quoting *Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 593 (3d Cir. 2012)). The proposed class settlement must also satisfy the requirements of Federal Rule of Civil Procedure 23, *Amchem,* 521 U.S. at 620, which requires the proponents of class certification to demonstrate that all of the requirements of Rule 23(a) are met—that is, that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Additionally, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). One option, under Rule 23(b)(3), allows a class action to be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions

affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

> i. **Rule 23(a) Factors**

The proposed Amended Settlement Agreement easily meets Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation. First, "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir. 2001). Here, payroll records show that there are 75 putative Class members. While this volume is by no means overwhelming, the Court concludes that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Hence, Rule 23(a)'s first prong is satisfied.

Second, the named plaintiff must "share at least one question of fact or law with the grievances of the prospective class." *Rodriguez v. Nat'l City Bank,* 726 F.3d 372, 382 (3d Cir. 2013) (quoting *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir. 1994)). The purpose of this commonality requirement is to test "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of SW v. Falcon,* 457 U.S. 147, 157 n.13 (1982). Here, the class members have several questions of fact in common because all servers allegedly were required to (a) participate in a tip pool over which they had no control, (b) share their tips with employees who did not render services directly to customers, (c) share their tips with the owner, and (d) surrender 5% of their credit card tips to management. *See generally* Declaration of Derek Leap; Declaration of Julian Guerra. In addition, the class members have common questions of law, namely whether Defendants' policies—the subjects of the common questions of fact—violated

7

the relevant statutes. The Court finds that this case, like many other cases involving wage claims, presents perhaps "the most perfect questions for class treatment." *Iglesias–Mendoza v. La Belle Farm, Inc.,* 239 F.R.D. 363, 373 (S.D.N.Y. 2007). As a result, Rule 23(a)(2)'s commonality requirement is satisfied.

Third, Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of the claims or defenses of the class. "[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." *Baby Neal,* 43 F.3d at 58 (citation omitted). Here, Rule 23(a)(3)'s typicality requirement is satisfied because Mr. Leap's claims are virtually identical in all respects to those of the other class members, as they all allegedly participated in the same improper tip pools at the Defendants' restaurants.

Fourth and finally, Mr. Leap and Class Counsel "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent," *Beck v. Maximus, Inc.,* 457 F.3d 291, 296 (3d Cir. 2006) (quoting *Amchem,* 521 U.S. at 625), and "assures that the named plaintiffs' claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class." *Id.* (quoting *Baby Neal,* 43 F.3d at 55). The Court must be satisfied that (a) plaintiffs' attorneys are qualified, experienced, and generally able to conduct the litigation; and (b) the interests of the named representatives are not antagonistic to those of other class members. *See In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 532 (3d Cir. 2004). Here, Mr. Leap appears to have no interests antagonistic to the interests of the absent class members. In

addition, the active lawyers for the Plaintiffs, Mr. Goldman and Ms. Ballard, have appropriate experience with class action litigation. *See Leap*, 2015 WL 619908, at *8. These lawyers have comported themselves well during the pendency of the case.

### ii. Rule 23(b) Requirements

The parties have elected to proceed under Rule 23(b), which requires the court to:

> find[ ] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
> **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;
> **(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;
> **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> **(D)** the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3). *See also generally Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). The "focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 240, 266 (3d Cir. 2009). Each element of the claims need not be susceptible to common proof in order to satisfy the predominance requirement of Rule 23(b)(3). *See Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1197 (2013).

Although "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)," *Comcast,* 133 S. Ct. at 1432, it is easily met here. As the Motion explains, and the Court agrees, "Hikaru management [allegedly] had an unlawful system, and all servers were subjected to it. The class' interests are aligned and unified, and common questions predominate." Pl.'s Mot. at 16.

9

The Court also finds that a class action is a superior mechanism for resolving this dispute. First, Mr. Leap and the class members have limited financial resources to prosecute individual actions, so there appears to be little interest in bringing separate actions. "Given the relatively small amount recoverable by each potential litigant, it is unlikely that, absent the class action mechanism, any one individual would pursue his claim, or even be able to retain an attorney willing to bring the action." *Lake v. First Nationwide Bank,* 156 F.R.D. 615, 626 (E.D. Pa. 1994). Second, the Court is unaware of any other lawsuits that have been filed against the Defendants with the same allegations. Third, the allegedly wrongful conduct occurred in Philadelphia, so this Court is a desirable forum for the litigation. Finally, there would be no foreseeable difficulties in managing a class action in this case.

Having concluded that the Plaintiffs have met the relevant burdens under Rule 23, the Court will certify the proposed Class for the purposes of settlement approval.

### B. Collective Certification

When analyzing the certification of a collective action, "the standard to be applied on final certification is whether the proposed collective plaintiffs are 'similarly situated.'" *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 536 (3d Cir. 2012) (citing 29 U.S.C. § 216(b)). Factors which the court should consider include, but are not limited to: "whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment." *Id.*

In this case, the Court first notes that the final certification of the Collective is unopposed. As to the factors referenced in *Zavala*, all members of the Collective worked as servers in Philadelphia at one or both of the Defendants' restaurants. Additionally, all members

of the Collective advance the same claims – that they were illegally required to (a) participate in a tip pool over which they had no control, (b) share their tips with employees who did not render services directly to customers, (c) share their tips with the owner, and (d) surrender 5% of their credit card tips to management – and they all seek the same relief. Finally, because all Collective members were servers, they had sufficiently similar salaries and circumstances of employment.

Consequently, the Court concludes that the proposed Collective plaintiffs are similarly situated and will certify the Collective for the purposes of settlement approval.

### C. Final Settlement Approval

#### i. Class Action Settlement

Because it resolves the rights of absent parties, a settlement of a class action is not effective until approved by a court after "notice in a reasonable manner to all class members who would be bound by the proposal," Fed. R. Civ. P. 23(e)(1); *see, e.g.*, *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 349-50 (3d Cir. 2010), and "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). At the final approval hearing, class members, having received notice of the proposed settlement, may voice any objections. *See, e.g.*, *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 777-78 (3d Cir. 1995); *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 438-39 (E.D. Pa. 2008); David F. Herr, *Annotated Manual for Complex Litigation* § 21.632 (West, 4th ed. 2013).[3]

---

[3] As the Third Circuit Court of Appeals has explained:

> Usually, the request for a settlement class is presented to the court by both plaintiff(s) and defendant(s); having provisionally settled the case before seeking certification, the parties move for simultaneous class certification and settlement approval. Because this process is removed from the normal, adversarial, litigation mode, the class is certified for settlement purposes only, not for litigation. Sometimes, as here, the parties reach a settlement while the case is in litigation

The Third Circuit Court of Appeals has set forth nine factors, the so-called "*Girsh* factors," to be considered when determining the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation…

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotations and punctuation marks omitted); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 317 (3d Cir. 1998).[4] In *Prudential*, the Court of Appeals also identified additional non-exclusive factors for courts to consider for a "thoroughgoing analysis of settlement terms." *See In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010). Those factors include:

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved – or likely to be

---

posture, only then moving the court, with the defendants' stipulation as to the class's compliance with the Rule 23 requisites, for class certification and settlement approval. In any event, the court disseminates notice of the proposed settlement and fairness hearing at the same time it notifies class members of the pendency of class action determination. Only when the settlement is about to be finally approved does the court formally certify the class, thus binding the interests of its members by the settlement.

*Gen. Motors Corp.*, 55 F.3d at 776-78 (footnote omitted).

[4] A settlement represents the result of a process by which opposing parties attempt to weigh and balance the factual and legal issues that neither side chooses to risk taking to final resolution. Therefore, courts have given considerable weight to the views of experienced counsel as to the merits of a settlement. *See Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *Lake v. First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995) ("Significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class") (internal quotation omitted).

12

achieved – for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provision for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*See Prudential*, 148 F.3d at 323. While the Court must make findings as to the *Girsh* factors, the *Prudential* factors are merely illustrative of additional factors that may be useful.

Additionally, our Court of Appeals has held that although there is an overriding public interest in settling class actions, district courts should apply "an even more rigorous, heightened standard in cases where settlement negotiations precede class certification, and approval for settlement and class certification are sought simultaneously." *Pet Food*, 629 F.3d at 350 (internal quotations omitted). Thus, the Court must make an independent analysis of all of the *Girsh* factors (and the *Prudential* factors, as appropriate) and may affirmatively seek additional information to the extent that the parties have failed to supply adequate information or have provided only conclusory statements. *See id.* at 350-51.

In this case, the majority, if not all, of the *Girsh* factors suggest that the Amended Settlement Agreement is "fair, reasonable, and adequate." Having rectified the structural problem with the initial settlement's attribution of 100% of any Class/Collective Members' recovery to FLSA damages and permitting only Opt-In Plaintiffs to recover from the Settlement Fund, the Court is now satisfied that the Amended Settlement Agreement is "fair, reasonable, and adequate." Consequently, the Court will grant final approval of the Amended Settlement Agreement.

Class Counsel advance four principal arguments in support of the Motion for Final Approval: (1) the Amended Settlement Agreement is the product of extensive negotiations between experienced attorneys that occurred over several weeks, so it is likely to be in the best interest of the class; (2) the Amended Settlement Agreement "achieves all of the objectives of

the litigation, namely a substantial monetary settlement to those employees of Defendants who were not paid the full amount of their gratuities due to the inclusion of cooks, chefs, and managers in the tip pool," (Pl.'s Mem. 9); (3) the inherent risks and uncertainties of litigation favor approval of the settlement; and (4) citing the fact that the opt-in rate in a FLSA collective action not backed by a union is generally between 15 and 30 percent, *see Ellis v. Edward D. Jones & Co., LP*, 527 F. Supp. 2d 439, 444 (W.D. Pa. 2007), Plaintiffs' counsel conclude that "[t]he response to the settlement notice is reasonable." Pl.'s Mem. 11.

An analysis of the *Girsh* factors suggests that the majority of those factors, if not all, upon close consideration are either neutral or weigh in favor of settlement.

Although the parties did not discuss the complexity, expense, and likely duration of the litigation, the Court can see for itself that various legal issues (e.g., the status of sushi chefs under various state laws and the challenges of maintaining a joint class and collective action) suggest that the case is complex. With complexity comes expense and, too often, delay, begetting even more expense and sometimes even more complexity, *ad infinitum*. Consequently, the complexity, expense, and likely duration of the litigation (or perhaps the avoidance of such undesirable traits), weigh in favor of the settlement.

No objections to the Amended Settlement Agreement have been filed and no class members have opted out of the class, but only 23% of the putative Class—17 of the 75 putative Class Members—opted in to the litigation, representing only 34% of the hours worked. While the initial settlement would have resulted in 77% of the Class Members releasing their class action claims and receiving no compensation in return, and only 34% of the Net Settlement Fund being paid to Class Members, with the Court's encouragement the Amended Settlement Agreement sufficiently resolves those issues. Under the Amended Settlement Agreement, 100%

14

of the Class Members will have an opportunity to recover their pro rata share of the damages attributed to the class action claims. Therefore, the reaction of the class to the settlement weighs in favor of the settlement.

The parties represent that they have engaged in extensive discovery, which helps to ensure that they "have an adequate appreciation of the merits of the case before negotiating." *Prudential*, 148 F.3d at 319. Consequently, the stage of the proceedings and amount of discovery completed weighs in favor of the settlement.

Class Counsel emphasize that they believe they would ultimately prevail at trial, but also concede that there are risks in continued litigation. As noted in relation to the complexity, expense, and duration of the litigation, various legal issues, including the status of sushi chefs, support Class Counsels' assertion that the litigation involves risks. As a result, the risk of establishing liability and damages weighs slightly in favor of the settlement.

Similarly, Class Counsel argue generally that maintaining a class through trial would be risky, since the class has been certified only preliminarily and only for settlement purposes. Consequently, the risk of maintaining the litigation weighs slightly in favor of the settlement.

Class Counsel explain that there has been serious sustained concern that at least one of the Defendants would file for bankruptcy, so it is unlikely that they are able to withstand a much greater judgment. Thus, the inability of the Defendants to withstand a greater judgment weighs in favor of the settlement.

"The reasonableness of a proposed settlement depends in part upon a comparison of the present value of the damages the plaintiffs would recover if successful, discounted by the risks of not prevailing." *Boone v. City of Phila.*, 668 F. Supp. 2d 693, 712 (E.D. Pa. 2009) (citing *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 806 (3d Cir.

15

1995)). Based on the discovery completed by the parties the greatest possible recovery appears to be about $250,000. *Leap*, 2015 WL 619908, at *4. Thus, a settlement amount of $225,000, which reflects a 10% discount for risk and avoiding the costs of litigation, falls well within the range of reasonableness. Therefore, the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation weighs in favor of the settlement.

Among the permissive *Prudential* considerations for determining whether to approve a class action settlement is "the degree of direct benefit provided to the class." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013). This analysis includes consideration of "the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to the claimants' estimated damages, and the claims process used to determine individual awards." *Id.* Under the initial agreement, none of these factors weighed in favor of approving the settlement. However, the Amended Settlement Agreement provides substantial direct benefit to the class and ensures that all class members have the opportunity to recover from the Net Settlement Fund, even if they did not opt in to the litigation.

Consequently, having examined the Amended Settlement Agreement in light of the *Girsh* and *Prudential* factors, the Court concludes that the Amended Settlement Agreement is "fair, reasonable, and adequate."

### ii. Collective Action Settlement

When evaluating a collective action settlement of FLSA claims, district courts must determine whether the settlement is a "fair and reasonable resolution of a bona fide dispute." *Adams v. Bayview Asset Mgmt., LLC*, 11 F. Supp. 3d 474, 476 (E.D. Pa. 2014) (citing *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1355 (11th Cir. 1982)). "A proposed

settlement will be held to resolve a bona fide dispute where the settlement 'reflect[s] a reasonable compromise over issues, such as . . . back wages, that are actually in dispute' and it is not a 'mere waiver of statutory rights brought about by an employer's overreaching.'" *Keller v. TD Bank, N.A.*, No. CIV.A. 12-5054, 2014 WL 5591033, at *14 (E.D. Pa. Nov. 4, 2014) (citing *Lynn's Food Stores, Inc.*, 679 F.2d at 1354).

In this case, the settlement clearly reflects a compromise over issues that are actually in dispute. Mr. Leap and the Opt-In Plaintiffs sued the Defendants for back wages due to the allegedly illegal tip practices. The Amended Settlement Agreement provides compensation to the Opt-In Plaintiffs for those alleged violations. In fact, the Opt-In Plaintiffs will receive $5.96 per hour worked, more than the tip credit claim of $4.42 per hour under the FLSA. For these reasons, and many of the reasons supporting the fairness of the settlement of the class claims, the Court concludes that the proposed Amended Settlement Agreement is a "fair and reasonable resolution of a bona fide dispute."

### D. Attorneys' Fees

Class Counsel seek 30% of the Settlement Fund ($67,500) in attorneys' fees, $13,578 in costs, and a $5,000 service award for Mr. Leap.[5] In the Third Circuit, district courts consider seven factors when determining the reasonableness of a requested fee under the percentage-of-recovery method. The factors are: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the

---

[5] Class Counsel initially requested 33% of the Settlement Fund ($75,000) in attorneys' fees, $6,078 in costs, and the same $5,000 service award for Mr. Leap. *See* Proposed Final Order and J. (Docket No. 42-1). However, the amendment to the agreement calls for increased costs to compensate for the class administrator's additional work of sending out Class Members' checks. Class Counsel proposed to offset the additional expense by reducing the attorneys' fees from $75,000 to $67,500, representing a fine example of professionals bowing to the clients' ultimate interests as well as their considered assessment of the realities of this particular case at this particular time. *See* Revised Am. to Joint Stip. of Settlement and Release.

settlement terms and/or the fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by counsel; and (7) awards in similar cases. *See Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000). In addition to reviewing these factors, "it is 'sensible' for district courts to 'cross-check' the percentage fee award against the 'loadstar' method." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) (citing *Prudential*, 148 F.3d at 333).

Class Counsel claim that all seven considerations favor granting the requested fees. As to the first factor, the Settlement Fund is $225,000 and all 75 Class/Collective Members will benefit from the settlement. The second factor likewise weighs in favor of the award because there were no objections to the settlement terms or the fees requested. As to the third factor, the attorneys are skilled and efficient based on their resumes and the result achieved. *See Leap*, 2015 WL 619908, at *8. Fourth, the case is admittedly complex due to the combination of FLSA and class action claims. As noted previously, the risk of nonpayment in this case is greater than usual when one considers the possibility of one of the Defendants declaring bankruptcy. Counsel spent substantial time on this case, having spent over 370 hours working on the litigation as of a year ago. Finally, fee awards in common fund cases within in this district generally range between 19% and 45% of the fund. *Stagi v. Nat'l R.R. Passenger Corp.*, 880 F. Supp. 2d 564, 571 (E.D. Pa. 2012). Consequently, the 30% requested by Class Counsel in this case is reasonable, especially when one considers Class Counsels' willingness to reduce its fee request in order to account for the additional costs of sending checks to the entire Class.

In addition to the *Gunter* factors weighing in favor of the requested attorneys' fees in this case, the loadstar cross-check also suggests that the requested fees are reasonable. As of May

2015, the loadstar of Class Counsel was roughly $165,000. *See* Pl.'s Pet. at 8. That figure, more than two times the requested fee, does not account for the substantial hours that Class Counsel has spent attempting to complete the settlement, including amending the agreement. Therefore, the loadstar cross-check certainly confirms the reasonableness of the requested fee award.

The Court is satisfied with the reasonableness of the requested fee and will award Class Counsel $67,500 in fees and $13,578 in costs.[6] Additionally, the Court will approve the $5,000 service award for Mr. Leap. *See Leap*, 2015 WL 619908, at *4 ("The settlement provides for only a modest service award for Mr. Leap . . . because, as the Motion explains, Mr. Leap was critical to having the case go forward").

## V. CONCLUSION

For the foregoing reasons, the Court grants the Joint Motion for Approval of Amendment to Joint Stipulation of Settlement and Release, grants Plaintiff's Motion for Final Approval of Class and Collective Action Settlement, and grants in part and denies in part Plaintiff's Petition for Award of Attorneys' Fees, Costs, and Class Representative Service Award.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

---

[6] In awarding Class Counsel $67,500 in fees, the Court will technically be granting in part and denying in part Plaintiff's Petition for Award of Attorneys' Fees, Costs, and Class Representative Service Award because the Petition requested $75,000 in fees, as it did not account for the unforeseen increased costs paid to the class administrator.